**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

-----------------------------------------------------x

Anne Davis, Angelica Neris, and
Jaceta Streeter,

                                                                    **COMPLAINT**

                    Plaintiffs,

          v.                                        Case No.

United States of America,

                    Defendant.

-----------------------------------------------------x

Plaintiffs, Anne Davis, Angelica Neris, and Jaceta Streeter, by and through their attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Untiedt Dabdoub, PLLC, for their Complaint against Defendant as above captioned, bring claims and allege as follows upon information and belief:

**<u>INTRODUCTION</u>**

1.     Lenton Jerome Hatten (hereinafter "Officer Hatten") was a former sports specialist or correctional officer at Federal Correctional Institute, Tallahassee (hereinafter "FCI Tallahassee") who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape at least 11 women who were incarcerated at FCI Tallahassee in the custody of the United States Bureau of Prisons (hereinafter "BOP") while he was employed there. Instead of protecting the women who were

under his care and control, Officer Hatten was allowed and emboldened by BOP to prey upon them.

2.    Plaintiffs Anne Davis (hereinafter "Ms. Davis"), Angelica Neris (hereinafter "Ms. Neris"), and Jaceta Streeter (hereinafter "Ms. Streeter") were each a victim who was sexually abused by Officer Hatten while incarcerated at FCI Tallahassee, an all-female, low-security federal prison. Over time, Officer Hatten groomed, manipulated, and coerced each Plaintiff into sexual submission, using the power and resources that he had at his disposal as a correctional officer as well as a sports specialist who supervised many prisoners who worked in the recreation department (colloquially known as "rec").

3.    Officer Hatten had an apparent *modus operandi* that was known to other BOP staff where he would exploit his power as a correctional officer and isolate himself with female prisoners in areas of FCI Tallahassee that were known to have no security cameras. For instance, as a sports specialist, he was able to, and often did, isolate himself with women in the recreation shack (hereinafter "rec shack"), which is a small shed located in the far back of the recreational yard. There was no security camera inside the rec shack; there was one at the entrance that would apparently capture in real time who arrived and left the rec shack, but not what occurred inside. Officer Hatten had a key to the rec shack, and could lock prisoners inside as he desired. Other isolated areas within FCI Tallahassee without security

cameras where Officer Hatten would spend time alone with prisoners included the food services area commonly known as the "kitchen"; and the second floor of a recreational building (which is a separate building from the rec shack, with food services on the first floor), commonly known as "upstairs rec." Even though BOP staff should have noticed Officer Hatten's recurrent behavior of locking prisoners into an enclosed space alone with him, nothing was done to stop his suspicious behavior.

4.      Plaintiff Ms. Streeter is one of the victims who were sexually abused by Officer Hatten. Ms. Streeter has been continuously incarcerated at FCI Tallahassee since in or around October 2019, except for an interim period from around August 2021 through March 2022 when she was incarcerated at Federal Prison Camp Marianna (hereinafter "Marianna Camp") instead. Officer Hatten initiated sexual contact with Ms. Streeter in or around early 2021 when Ms. Streeter began to volunteer to work at rec with hopes of spending more time outside of COVID-19 quarantine. He began by making inappropriate sexual comments regarding Ms. Streeter's relationship with other women. In or around April 2021, Officer Hatten progressed to rubbing his genitals against her buttocks. Ms. Streeter recalls one instance when Officer Hatten escorted her to the rec shack to get some ice, and while she was bent over the ice machine, Officer Hatten came behind her and intentionally grinded his penis against her buttocks through her clothes.

Following this incident, Officer Hatten continued to make sexual comments to Ms. Streeter, for example saying "why you dragging the wagon" in reference to her buttocks.

5. In or around July or August 2021, Officer Hatten escalated his abuse and vaginally raped Ms. Streeter when she was volunteering at the rec shack, where he knew there was no security camera. On the day of the assault, Officer Hatten ordered Ms. Streeter to clean the bathroom in the rec shack, and while she was cleaning, he entered the bathroom and propositioned her for a sexual favor. Ms. Streeter froze, as there was no way to escape the bathroom without passing by Officer Hatten. He proceeded to rape Ms. Streeter from behind, while she was bent over the toilet. Shortly after the rape, Ms. Streeter was transferred to Marianna Camp, thereby briefly escaping Officer Hatten, but then was brought back to FCI Tallahassee in or around March 2022 and was placed in the special housing unit (hereinafter "SHU") for many months where Officer Hatten made sexual comments to her while passing by her cell. Officer Hatten continued to make sexual advances to Ms. Streeter including one additional occasion when he rubbed his body against Ms. Streeter's backside while escorting her to the rec yard in handcuffs. Other BOP personnel knew or should have known that Officer Hatten's sudden interest in the SHU and his continued one-on-one interactions with Ms. Streeter was highly suspicious, but they did not intervene.

6.     Plaintiff Ms. Neris is another victim who was sexually abused by Officer Hatten. Ms. Neris was incarcerated at FCI Tallahassee from around December 2019 through around the end of 2023, when she was transferred to another BOP facility in the State of Texas where she remains. Ms. Neris encountered Officer Hatten when she was working in the kitchen, starting in or around August 2021. Officer Hatten started by making sexual comments, fondling her body, and gifting her with certain items that were not otherwise available, gradually crossing the ethical boundaries between staff and prisoner. Upon information and belief, even though he was still a rec officer, Officer Hatten started to pick up numerous overtime and/or additional shifts in the kitchen to spend time with Ms. Neris. Officer Hatten's brazen acts should have been noticed by BOP staff across the departments and throughout the facility. Yet Officer Hatten was repeatedly allowed to spend unsupervised time with Ms. Neris, contrary to the BOP protocols where at least two officers should have been present at a time to supervise the prisoners working in the kitchen. In rec and in the kitchen, Officer Hatten was always allowed to supervise prisoners by himself.

7.     During the two months that Ms. Neris worked in the kitchen, from around August 2021 through around October 2021, Officer Hatten sexually assaulted Ms. Neris on about three separate occasions with increasing level of aggression. During the first incident, Officer Hatten groped her lower back, buttocks, and inner

thighs in the kitchen. The next incident, Officer Hatten groped Ms. Neris's vagina outside of her clothing in the kitchen. For the last incident, Officer Hatten ordered Ms. Neris to come to upstairs rec. Upon her arrival at upstairs rec, Officer Hatten exposed his penis to her and forced her to fondle it. He then proceeded to grope her breasts and clitoris, and to digitally penetrate her vagina. Even though BOP staff should have noticed Officer Hatten's recurrent behavior of calling prisoners to off-camera areas and spending time with them, nothing was done to stop his suspicious behavior. After this assault, Ms. Neris did everything possible to avoid Officer Hatten. She quit her job in the kitchen. Nonetheless, whenever he would see her at rec, Officer Hatten continued to approach Ms. Neris and made harassing comments like, "You can't handle me" or "I'm not a snitch." Ms. Neris took these comments as a sexual advance as well as a threat that she should not "snitch" on him.

8.      Plaintiff Ms. Davis is another victim who was sexually abused by Officer Hatten. Ms. Davis has been continuously incarcerated at FCI Tallahassee since in or around April 2021. Ms. Davis's interaction with Officer Hatten became frequent in or around November or December 2021, when she was assigned to work in the rec shack under Officer Hatten's direct supervision. As with Ms. Streeter and Ms. Neris, Officer Hatten's abuse began with him making sexual comments, such as calling Ms. Davis "pretty." Over time, he began groping her body over her clothes, for example when she mopped in the rec shack. Officer Hatten also brought Ms.

Davis some gifts that are valuable in the prison, such as McDonald's coffee and nail polish. He would also single Ms. Davis out by putting her name on the call-out list to report to the rec shack when no one else would be around. It is highly unusual for a prisoner and an officer to spend time alone in the rec shack with no one else around. Officer Hatten's unusual behavior should have been noticed by other BOP staff including other recreational officers, Ms. Davis's unit team, and the facilities officers who typically monitor movements on the rec yard. No one stopped him.

9.    In or around January of February 2022, Officer Hatten escalated his abuse of Ms. Davis to digital and vaginal rape. One day, while Ms. Davis was cleaning the bathroom in the rec shack, Officer Hatten entered the bathroom, put his hands down her pants, and groped her. He proceeded to digitally penetrate her vagina and then to rape her with his penis. A few months later, in or around May or June 2022, Officer Hatten again called Ms. Davis out to the rec shack. This time, he accosted her while she was cleaning the rec shack hallway and vaginally raped her there. The second rape occurred during the evening hours when it was not normal for prisoners to be called to the rec shack for cleaning. Even though other BOP staff knew or should have known about Officer Hatten's suspicious conduct, no one intervened. After these two incidents of vaginal rape, Officer Hatten continued to grope Ms. Davis over the clothes and make sexually explicit comments to her until he left FCI Tallahassee in or around August 2022.

10.    Ms. Davis believes that the reason she was not raped again was because Officer Hatten was repeatedly assaulting another victim, Bonnie Hernandez (hereinafter "Ms. Hernandez"). Officer Hatten's blatant and apparent sexual abuse, which was widely known throughout the facility and yet condoned until his resignation in August 2022, indicated to Ms. Davis the rape culture at FCI Tallahassee and BOP staff's willful blindness to it.

11.    Officer Hatten's abuse of prisoners was not a secret. Officer Hatten was a boisterous individual, who made inappropriate sexual remarks to prisoners loudly and publicly. Officer Hatten's suspicious conduct and preferential treatment towards certain women was a widely known fact throughout FCI Tallahassee. Yet, BOP allowed him to roam the facility with numerous opportunities to isolate, stalk, harass, abuse, and assault women including the Plaintiffs until at least August 2022, when Officer Hatten decided to resign amid a criminal investigation that was initiated by Ms. Hernandez.

12.    As is common with prison sexual abuse victims, Plaintiffs suffered their sexual abuse in silence, lest they were retaliated against or deprived of the modest privileges they had as incarcerated individuals. Officer Hatten exercised complete dominion and power over them as a correctional officer, as he had the key to their cells and control over their prison jobs, safety, health, welfare, and contact with the outside world. Other BOP officers who knew or should have known about Officer

Hatten's sexual abuse permitted, condoned, enabled, or acquiesced to his misconduct, amplifying the Plaintiffs' fear of retaliation and sense of hopelessness. Plaintiffs only felt comfortable seeking legal counsel and reporting sexual abuse after Officer Hatten stopped working at FCI Tallahassee.

13.    On April 4, 2023, Officer Hatten was indicted for sexual abuse of one of his other victims, Ms. Hernandez, which was in violation of 18 U.S.C. § 2243(b). He quickly pled guilty on May 25, 2023, admitting in a statement of facts accompanying his plea agreement that he had engaged in sexual relationship between October 2021 and August 2022 with Ms. Hernandez. He was sentenced to three months of incarceration and five years of supervised release on August 24, 2023. *See United States v. Hatten,* No. 4:23-cr-18 (RH) (MAF) (N.D. Fl.). If the case had proceeded to trial, the Government would have proven beyond a reasonable doubt that Officer Hatten had used FCI Tallahassee as his playground, systematically grooming, manipulating, preying upon, and repeatedly raping Ms. Hernandez.

14.    Prior to Officer Hatten's guilty plea on May 25, 2023, United States had in its possession several other victims' claims of abuse against Officer Hatten including the Plaintiffs' torts claim forms. The extent to which these claims were investigated by the Government is unclear. By counsel, Ms. Streeter and Ms. Neris submitted victim impact statements to the Government prior to Officer Hatten's sentencing in August 2023; Ms. Streeter and Ms. Neris also underwent a voluntary

interview with the Government agents in August 2023 to report her abuse, which was conducted without notice to the Plaintiffs or their counsel. Plaintiffs did not receive any follow-up contact or any other update regarding Officer Hatten to date. He has not been criminally charged with any additional count.

15.     The Department of Justice (hereinafter "DOJ")'s refusal to prosecute BOP officers for sexual abuse is a well-known phenomenon. In another federal prison in Florida, Federal Correctional Coleman, there were at least six BOP officers who admitted in sworn statements to have sexually abused at least 10 female prisoners. DOJ's Office of the Inspector General (hereinafter "OIG") declined to investigate or prosecute any of these officers.[1]

16.     During relevant times, Officer Hatten's recurrent sexual abuse of incarcerated persons, including the Plaintiffs, was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee. Throughout Officer Hatten's employment at FCI Tallahassee until his

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 3.

resignation in or around August 2022, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hatten.

17. It was apparent to Plaintiffs and other victims incarcerated at FCI Tallahassee that BOP personnel would not intervene to prevent Officer Hatten's sexual assaults, let alone adequately discipline, supervise, or reprimand him in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, at least by 2020, BOP employees were aware that Officer Hatten was spending time alone with female prisoners and engaging in inappropriate sexual and/or flirtatious interactions with them. This highly abnormal behavior continued unchecked throughout Officer Hatten's tenure at FCI Tallahassee, with the acquiescence of other BOP officers acting within the course and scope of their employment.

18. One of the primary reasons Officer Hatten was able to continue abusing so many women for so long, including Plaintiffs, is because his fellow officers did not follow the operating protocols by sharing supervisory duties with him. Upon information and belief, two officers are required to be present during shifts to jointly supervise prisoners who work in rec or kitchen. Therefore, Officer Hatten should never have been alone with prisoners. However, BOP staff would frequently leave Officer Hatten to supervise prisoners by himself, including behind locked doors and/or during early morning or evening hours. Officer Hatten took advantage of his

fellow officers' dereliction of duties to accost, isolate, imprison, harass, abuse, assault, and rape women right under the eyes of the BOP.

19.    Officer Hatten took female prisoners to blind spots within FCI Tallahassee that were not captured by security cameras, contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Officer Hatten often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this.

20.    Officer Hatten brought contraband into FCI Tallahassee and used them as part of his *modus operandi* in sexual abuse. He knew and exploited how valuable contrabands are in prison, further trapping his victims financially as well as exposing them to a threat of punishment for possessing contrabands if they were to report him. BOP personnel who were tasked with inspecting prisoners' cells or personal effects knew that the Plaintiffs had certain items that must have been brought in from the outside. There was no intervention to correct or investigate this.

21.    Suspicions and allegations of Officer Hatten's sexual abuse abounded at FCI Tallahassee by the end of 2020, as many BOP employees saw, knew of, and disregarded Officer Hatten's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Tallahassee's security or operating protocols. Nevertheless, until August 2022, Officer Hatten continued to work as a

sports specialist and/or correctional officer at FCI Tallahassee with the willful ignorance and tacit approval of his colleagues and/or supervisors, leaving countless victims in his wake, including Plaintiffs.

22. It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as the abject systemic failures at FCI Tallahassee and BOP, that Officer Hatten's sexual abuse was able to occur and could continue unabated until August 2022.

23. As a result of the forementioned deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel as well as systemic failures at FCI Tallahassee, Plaintiffs were forced to engage in recurrent sexual encounters with Officer Hatten by threats of force or coercion. For each victim, what initially started as grooming and sexual comments eventually developed into assaultive rapes in 2021 or 2022. With the benefit of willful blindness or negligence of his coworkers, Officer Hatten became increasingly aggressive and threatening over time, using FCI Tallahassee as his personal brothel.

24. As prisoners under Officer Hatten's custodial, supervisory, and disciplinary authority, Plaintiffs did not have a meaningful escape from his predatory conduct. They felt that they had no choice but to comply with Officer Hatten's abuse. They knew that he could take away their privileges, jobs, outside contact, or even put them in the SHU, thereby lengthening their prison sentence. They also feared

that their reports regarding Officer Hatten would not be believed or taken seriously by the authorities. Indeed, this fear was proven true. Even after Ms. Hernandez took it upon herself to report Officer Hatten, the Government failed to explore the severity, frequency, and magnitude of Officer Hatten's abuse fully or accurately during his criminal proceeding, resulting in a mere 3-month sentence that does not begin to capture the egregious circumstances herein. Moreover, it was widely known among prisoners that after reporting Officer Hatten, Ms. Hernandez was placed in the SHU for "investigation," which further deterred other victims including the Plaintiffs from reporting Officer Hatten.

25.     Plaintiffs Ms. Davis, Ms. Streeter, and Ms. Neris each experienced catastrophic and unnecessary pain and suffering because of Defendant's egregious disregard for, and carelessness towards, Plaintiffs' safety and well-being despite the myriad warning signs regarding Officer Hatten's abhorrent conduct.

26.     Plaintiffs bring this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to them by various BOP personnel within the scope of their employment with the BOP, which in turn resulted in Officer Hatten's recurrent sexual abuse.

27.     Plaintiffs seek redress for Defendant's unlawful conduct, which caused them to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

28.    This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiffs' claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

29.    This Court has personal jurisdiction because the alleged incidents occurred within the confines of the State of Florida.

30.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the boundaries of this District and Division, in the County of Leon.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

31.    Plaintiffs have properly complied with the requirements of 28 U.S.C. § 2675 by presenting Administrative Claims against the United States of America, which provided the Government with adequate notice regarding Officer Hatten's abusive conduct and other BOP personnel's negligence related thereto. Each Plaintiff's Claim was timely filed with the BOP within two (2) years of the accrual of the causes of action. Specifically, Ms. Davis's Claim was filed on or around

September 15, 2023; Ms. Neris's Claim was filed on or around June 5, 2023; and Ms. Streeter's Claim was filed on or around February 27, 2023.

32.    On November 1, 2024, the BOP unilaterally denied each of the Plaintiffs' Claims. By filing this action within six months of that denial, each Plaintiff has hereby properly exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a). Moreover, this action is timely brought within the statutory time limits provided in 28 U.S.C. §§ 2401(b) and 2675(a).

## PARTIES

### Plaintiffs

33.    At all times relevant hereto, Plaintiff Ms. Davis was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Davis remains incarcerated at FCI Tallahassee.

34.    At all times relevant hereto, Plaintiff Ms. Neris was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Neris was transferred out of FCI Tallahassee in or around December 2023, and is currently incarcerated at a different federal prison in the State of Texas.

35.    At all times relevant hereto, Plaintiff Ms. Streeter was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at

501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee.

Ms. Streeter remains incarcerated at FCI Tallahassee.

## Defendant

36.    Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the FTCA. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

37.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters including at FCI Tallahassee and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Hatten.

38.    In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

39.    At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hatten, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

40.    At all times relevant hereto, Officer Hatten was a sports specialist, recreational officer, correctional officer, and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hatten was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

41.    At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants, and employees of Defendant United States, and within the course and scope of their employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

42.    At all times relevant hereto, Officer Hatten was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hatten was the authorized agent, servant, or contractor of Defendant United States, acting with the permission, ratification, approval, and consent of Defendant United States.

43. At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also agents, representatives, or employees of Defendant United States. At all times relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

44. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury on all issues and claims in this action that are so triable.

## FACTUAL BACKGROUND

### INDICATIONS AND WARNING SIGNS OF HATTEN'S SEXUAL ABUSE

45. Plaintiffs hereby repeat, reiterate, and incorporate by reference paragraphs 36 through 43 with the same force and effect as if fully set forth herein.

46. Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, DOJ

promulgated certain regulations, which remain binding on all BOP facilities, including FCI Tallahassee. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

47.   In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

   a. Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

   b. Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

c. Program Statement 3420.11 goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

d. Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

e. Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement 3420.11."

48. BOP policy requires training of all employees who may have contact with prisoners on how to fulfill their responsibilities under these rules and procedures.

49. Upon information and belief, Officer Hatten's employment at FCI Tallahassee began in or around 2018.

50. Prior to being placed in FCI Tallahassee, Officer Hatten worked at Marianna Camp, another female BOP facility that is located about an hour away from FCI Tallahassee in the State of Florida. Upon information and belief, BOP personnel at Marianna Camp were made aware of Officer Hatten giving commissary

items and/or paying for phone minutes for certain women prisoners, which was a warning sign of inappropriate relations with prisoners, in contravention of BOP protocols. Knowing this, BOP still placed Officer Hatten in FCI Tallahassee, a female facility where he would have access to more victims.

51.    Throughout the time that Officer Hatten worked as a sports specialist and/or correctional officer at FCI Tallahassee, from around 2018 through August 2022, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel. He utilized similar methods to stalk, assault, abuse, and terrorize at least 11 different victims incarcerated at FCI Tallahassee. His routines and *modus operandi* involved flagrant violations of FCI Tallahassee's security and operating protocols, which were and should have been obvious to other BOP personnel.

52.    From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten placing himself in posts where he would be alone and unsupervised with prisoners on their job details. He volunteered to supervise women working at rec when other officers were not around, and he also worked overtime in food services to supervise women working in the kitchen.

53.    From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors,

correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten spending substantial amounts of time alone with incarcerated women. They also observed him escorting certain women to various isolated areas within FCI Tallahassee, which were typically "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hatten frequently accompanied incarcerated women to these blind spots by himself.

54.    Officer Hatten, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as rec shack, upstairs rec, and the kitchen. He repeatedly took advantage of these known blind spots to brutally abuse his victims, including Plaintiffs, by raping them, digitally penetrating their vaginas, forcing them to perform oral sex, and/or fondling their body. Other BOP officers knew of, and disregarded, Officer Hatten's abnormal behavior of repeatedly isolating himself with certain prisoners and/or locking himself inside secluded structures with certain prisoners.

55.    Officer Hatten also abused his authority and flaunted his power by providing his victims with certain benefits or promises of benefits. For example, Officer Hatten also frequently brought contraband and gifts to his victims, including Plaintiffs Ms. Neris and Ms. Davis, which was or should have been obvious to other BOP personnel. Had BOP personnel conducted the needed investigations into the

benefits that certain prisoners had received from Officer Hatten, they would have discovered and stopped his sexual abuse before he began to rape and sexually assault the Plaintiffs in 2021 or 2022.

56. At FCI Tallahassee, Officer Hatten quickly developed a widespread reputation among women prisoners for being a "pervert" who said and did inappropriate things to them. This reputation was well known to other BOP personnel, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff.

57. With the COVID-19 pandemic, Officer Hatten's sexual abuse escalated. For social distancing purposes, correctional officers including Officer Hatten were given more power to isolate prisoners and control the prisoners' movements throughout the facility. Officer Hatten used this power to isolate, terrorize, and abuse his victims at his will. In addition, with COVID-19, other officers, particularly those working in rec, were even less likely to oversee or intervene in Officer Hatten's suspicious conduct than before.

58. Upon information and belief, Officer Cornelius Jones ("Officer Jones"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Jones allowed Officer Hatten to take women to various isolated locations, including the rec shack,

by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jones knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. He would openly refer to Officer Hatten as a "girl's man" and a "player," acknowledging his sexual behavior. Nonetheless, Officer Jones turned a blind eye and allowed Officer Hatten unfettered access to his victims. Officer Jones himself was verbally abusive to prisoners, calling them ugly, fat, "bitch," or sexually degrading terms, supporting his dismissive attitude towards Officer Hatten's sexually abusive conduct.

59.    Upon information and belief, Officer Eric Love ("Officer Love"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Love allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Love knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Upon information and belief, Officer Love had witnessed a prior incident wherein another recreational officer at FCI Tallahassee, Jimmy Highsmith, had sexually abused a woman and was eventually convicted of that crime. Therefore, Officer Love knew or should have known the indications, signs, and concerns of Officer Hatten's

sexually abusive conduct. Nonetheless, Officer Love turned a blind eye and allowed Officer Hatten unfettered access to his victims.

60. Upon information and belief, Officer Larry Mitchell ("Officer Mitchell"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Mitchell allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Mitchell knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Mitchell turned a blind eye and allowed Officer Hatten unfettered access to his victims.

61. Upon information and belief, Officer Nicole Lakoe Jackson ("Officer Jackson"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift and had a close friendship with Hatten. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Jackson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jackson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or

bringing them contraband gifts. In fact, upon information and belief, around October 2021, Officer Jackson made a comment to Ms. Hernandez and another prisoner that, "y'all need to go sit outside with y'all daddy," referring to Officer Hatten. Upon information and belief, there was also a separate incident in 2021 when Warden Erica Strong and Assistant Warden Kimberly Neely reprimanded Officer Hatten and Officer Jackson for allowing certain inmates to stay in rec during the hours they were not allowed to be there. Despite her apparent awareness of inappropriate relationships between Officer Hatten and certain women, Officer Jackson turned a blind eye and allowed Officer Hatten unfettered access to his victims.

62.   Upon information and belief, Officer Lee Adamson ("Officer Adamson") was the recreation supervisor with authority over Officer Hatten as well as Officers Jones, Love, Mitchell, and Jackson. Instead of monitoring, supervising, and disciplining Officer Hatten pursuant to the BOP protocols, Officer Adamson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Adamson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them gifts. Nonetheless, Officer Adamson turned a blind eye and allowed Officer Hatten unfettered access to his victims. Upon information and belief, Officer Adamson favored Officer Hatten over other recreational officers and condoned his inappropriate behavior, emboldening Officer Hatten to use the prison facility as his

personal brothel. For example, Officer Adamson would give Officer Hatten the first chance at overtime assignments before other recreational officers. In addition, Officer Adamson allowed Officer Hatten to unilaterally re-hire certain women who had previously been fired from the rec jobs, and allowed him to assign them to his own personal crew.

63.    Upon information and belief, Officer Christopher Shephard ("Officer Shephard"), another correctional officer who was frequently assigned to food services, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Shephard allowed Officer Hatten to take women to various isolated locations, including the kitchen and upstairs rec, by himself. Officer Shephard knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Shephard turned a blind eye and allowed Officer Hatten unfettered access to his victims.

64.    Given the overtness and frequency with which Officer Hatten preyed upon women who were under his custody, other BOP personnel suspected or should have suspected that Officer Hatten was sexually abusing prisoners. Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against

inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

65.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Shephard had numerous opportunities to follow the above-mentioned mandates and stop Officer Hatten's misconduct. Officer Hatten's actions were abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers, whose identity is currently unknown to the Plaintiffs, saw or should have seen that Officer Hatten frequently disappeared into unmonitored areas with prisoners who were not authorized to be in those areas

alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Officer Hatten's suspicious and recurrent behavior.

66.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Shephard failed to investigate, discipline, supervise, monitor, question, or stop Officer Hatten despite numerous indications of sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

67.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and Shephard condoned, permitted, acquiesced to, consented to, and tacitly approved Officer Hatten's longstanding abuse of prisoners. Officer Hatten's ongoing abuse of multiple prisoners at FCI Tallahassee was so widely known throughout the prison that the staff turned it into a running joke. Instead of following protocols to protect the prisoners in their care, the prison staff sat around making jokes at their expense. Their actions – and inactions – allowed Officer Hatten to rape and abuse multiple women with impunity.

68.    Before Officer Hatten vaginally raped Ms. Streeter in the summer of 2021, digitally raped Ms. Neris in the fall of 2021, and digitally and vaginally raped Ms. Davis in the beginning of 2022, agents, servants, contractors, and employees of

BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee, were aware of suspicions, indications, or concerns regarding Officer Hatten's sexual misconduct. They were aware of Officer Hatten's frequent protocol violations and unexplained suspicious interactions with certain prisoners. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Officer Hatten.

69.    It is extraordinary and inexplicable that Defendant United States continued to allow Officer Hatten to spend time alone with female prisoners in isolation, creating daily opportunities for him to commit additional sexual assaults.

70.    The fact that Officer Hatten could get away with sexual abuse while flagrantly violating BOP's policies led his victims, including the Plaintiffs, to believe that he was untouchable. The victims had legitimate concerns that they would suffer retaliation or other substantial harm if they were to report Officer Hatten's assaults. To further fuel this fear, Officer Hatten verbally threatened his victims, including the Plaintiffs, to ensure their silence. He reminded his victims that he had the power to take away their privileges, transfer them to a different facility away from their families, put them in the SHU, or take away their jobs.

71.    BOP personnel at FCI Tallahassee, including lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and

investigators, knew Officer Hatten's reputation as a sexual predator. They also knew that female prisoners are reluctant to come forward with information regarding staff sexual abuse for fear of reprisal and loss of work privileges. Despite these known issues, FCI Tallahassee granted Officer Hatten unrestricted and unsupervised contact with numerous women, emboldening him to abuse his position of authority to threaten, violate, and assault his victims.

## HISTORY OF SEXUAL ABUSE AT FCI TALLAHASSEE – "DEN OF DESPAIR"

72.    FCI Tallahassee has a long and sordid history of sexual abuse within its facility by correctional officers against the prisoners whom they were duty-bound to protect.

73.    The facility first gained notoriety in 2006 when there was a shoot-out between a correctional officer and Federal Bureau of Investigation ("FBI") agents that led to the death of two people. In that case, the FBI was present to investigate and arrest six guards for sexually abusing the female prisoners in their custody.[2]

74.    FCI Tallahassee has one of the highest rates of staff-on-prisoner abuse complaints in the country, receiving more than 130 complaints since 2012.[3] It is highly likely that the problem is even more widespread than this figure suggests, but

---

[2] *2 federal employees die in Fla. prison shooting*, NBC News, June 21, 2006 at 9:23 AM, https://www.nbcnews.com/id/wbna13415618
[3] Silja J.A. Talvi, *WOMEN REPORT 'RAMPANT' SEXUAL ABUSE AT FEDERAL PRISON WHERE GHISLAINE MAXWELL IS HELD*, The Appeal, Apr 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/

that it goes largely unchecked because of cultural tolerance, cover-ups, and organizational reprisals against prisoners who dare to report staff abuse.

75.    Physician assistant Paul Rolston is alleged to have sexually abused numerous women under his care in FCI Tallahassee beginning in around 2018. Despite several civil complaints filed against PA Rolston, instead of firing this serial abuser, FCI Tallahassee simply transferred him to a male facility, continuing the cycle of silence and abuse at FCI Tallahassee and further perpetuating the environment that protected the abusers at the cost of vulnerable women.[4]

76.    In August 2021, Officer Phillip Golightly was sentenced to 24-months' imprisonment for sexually abusing female prisoners in his care.[5] Even though Officer Golightly was indicted for, and pled guilty to, sexual abuse of only one victim, additional victims who suffered sexual abuse by Officer Golightly were acknowledged as part of the court records.[6] Upon information and belief, Officer Hatten and Officer Golightly, a convicted sexual abuser, were friendly with each other and knew about each other's sexually abusive conduct. In the same way that Officer Hatten summonsed his victims to the isolated rec shack or upstairs rec,

---

[4] *Id.*

[5] *Former Bureau of Prisons Correctional Officer Sentenced to 24 Months In Federal Prison For Sexually Abusing Prisoners*, Press Release U.S. Attorney's Office, Northern District of Florida, Aug. 27, 2021, https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.

[6] *Id.*

Officer Golightly called his victims to food services to sexually assault them, even though they did not even work in food services.

77.    In December 2021, another former recreational specialist at FCI Tallahassee, Officer Jimmy Lee Highsmith, was found guilty by a jury of sexually abusing a prisoner.[7] Upon information and belief, numerous complaints were filed against Officer Highsmith by women at FCI Tallahassee beginning around 2014, and yet BOP personnel at FCI Tallahassee ignored these complaints to keep him employed as a supervisor for women working in rec—same as in Officer Hatten's case.

78.    These are not the only correctional officers who reportedly sexually abused prisoners at FCI Tallahassee during relevant period. For example, at least one civil lawsuit has been filed against Officer Antoine J. Hand.

79.    There are many similarities in *modus operandi* of Officers Golightly, Highsmith, Hand, and Officer Hatten's sexual abuse, including taking women to off-camera areas by themselves and/or using their jobs as a basis for sexual coercion. Therefore, BOP personnel at FCI Tallahassee, including but not limited to recreational officers, supervisors, executive staff, and investigators, knew or should

---

[7] *Jury Convicts Former Tallahassee Federal Correctional Officer Of Sexual Abuse of Prisoner*, Press Release U.S. Attorney's Office, Northern District of Florida, Dec. 17, 2021, https://www.justice.gov/usao-ndfl/pr/jury-convicts-former-tallahassee-federal-correctional-officer-sexual-abuse-inmate.

have known that Officer Hatten's conduct was highly indicative of sexual abuse. Nonetheless, BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

80.   BOP personnel's reckless disregard of the safety and welfare of victims including the Plaintiffs is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Tallahassee throughout the relevant times. Officer Hatten fed into, and was also encouraged and enabled by, this toxic culture at FCI Tallahassee.

81.   Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Tallahassee as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States,

through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[8]

82.    Despite this established history of sexual abuse in BOP custody and at FCI Tallahassee specifically, Defendant United States failed to institute a reliable practice for detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Tallahassee's PREA audit reports that were published on or around July 6, 2021, and July 4, 2023, claimed that FCI Tallahassee was compliant with all PREA standards. Even though this audit report was published after PA Rolston and Officers Golightly, Highsmith, and Hatten's sexual abuse became public through criminal investigation, this obvious non-compliance with PREA standards cannot be found anywhere in the reports. This blatant deficiency reflects the culture of Defendant United States of turning a blind eye to sexual abuse of people incarcerated in BOP custody.

83.    Based on the history of sexual abuse at FCI Tallahassee, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas.

---

[8] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 4.

84.    Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Hatten from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

85.    Upon information and belief, from around August 2019 through July 2022, Officer Hatten sexually abused numerous women in his custody at FCI Tallahassee. Other than the three Plaintiffs, eight additional women have reported Officer Hatten's abuse to the BOP and/or FBI and other external investigative agencies.

86.    Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Tallahassee before, during, and after Officer Hatten's rapes and abuse of the Plaintiffs.

### OFFICER HATTEN's SEXUAL ABUSE OF PLAINTIFFS

87.    Emboldened by other BOP personnel's failure to stop him, with increasing fearlessness, Officer Hatten used the tools available to him through the BOP, such as access to prisoners, control over their jobs and livelihood, and blind spots from cameras, to violate and terrorize his victims, including the Plaintiffs.

*Facts Pertaining to Plaintiff Ms. Streeter*

88.   Ms. Streeter first arrived at FCI Tallahassee in or around October 2019 at 39 years of age. She remained incarcerated there until around August 2021 when she was briefly transferred to Marianna Camp, and again from around March 2022 to the present.

89.   Throughout this time, Ms. Streeter was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Streeter from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

90.   A few months after Ms. Streeter arrived at FCI Tallahassee, the facility was placed under lockdown in response to the COVID-19 pandemic. Movements within the facility were highly restricted, and prisoners were only allowed one hour per day of recreational time. Each unit was assigned a particular time of day when

they could go outside for recreation. Ms. Streeter initially met Officer Hatten during the allotted recreational time, as he was one of the guards on duty in the rec yard.

91. Using the COVID-19 pandemic to his advantage, Officer Hatten found ways to make sure that he was the only correctional officer escorting certain women to rec and staying with them in certain locations at rec. For example, he would take women to the rec shack while other officers were in upstairs rec, and vice versa. This was in violation of the operating protocols under which at least two officers should have supervised women working recreation details. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

92. Upon information and belief, around mid-2020, Officer Hatten began to lock certain women into the rec shack with an intent to abuse them there without interruption. This *modus operandi* continued undeterred, up to his assaults of Ms. Streeter in the rec shack in 2021. There were times when Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson would notice the rec shack door being locked. Even though they knew or should have known that Officer Hatten was there with a prisoner, they took no step to intervene or protect the prisoner.

93.     Officers Jones, Love, Mitchell, Jackson, and Adamson violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

94.     Ignorant to Officer Hatten's *modus operandi*, in or around April 2021, Ms. Streeter began to volunteer to work in rec when it was her unit's time to go outside. She volunteered with hopes to spend more time outside of her housing unit with fresh air, which was valuable during the COVID-19 pandemic.

95.     As a result of her volunteering, Ms. Streeter had daily interactions with Officer Hatten. He showed an increasing level of interest in Ms. Streeter, becoming more comfortable and friendly over time. He groomed Ms. Streeter, making inappropriate comments about her relationships with other women, like "Oh, you going that way now," or "You bat for that team." He would also make light of those relationships, indicating that sexual relationship with men is better. Ms. Streeter did not want to make an officer upset, so she tried to rationalize or dismiss these initial comments.

96.     At Officer Hatten's behest, Ms. Streeter became the person in her unit who would go to the rec shack to get equipment for other prisoners. This gave Officer Hatten additional opportunities to spend time with Ms. Streeter in the rec shack, testing the boundaries.

97.     In or around April 2021, Officer Hatten escalated his sexual abuse. One day, Ms. Streeter saw Officer Hatten in the rec yard. She approached him, asking to use the ice machine in the rec shack as the machine in her unit was broken at the time. Officer Hatten escorted her alone to the rec shack. As Ms. Streeter bent down to use the ice machine, Officer Hatten approached from behind and purposefully rubbed his genitals against her buttocks.

98.     Normally, prisoners were required to follow the rules to be escorted by an officer from their unit to recreation, unless they are accompanied by other prisoners from their unit. Instead, Officer Hatten spent a substantial amount of time with Ms. Streeter alone inside the rec shack. There were no security cameras that captured the inside of the rec shack. Such conduct was prohibited by BOP protocols. Nonetheless, BOP staff exercised no effort to investigate or stop Officer Hatten's suspicious conduct.

99.     After this incident of physical contact, Ms. Streeter tried to avoid interacting with Officer Hatten. However, Officer Hatten would come to Ms. Streeter's housing unit under the pretense of dropping off some rec equipment. He

continued to make frequent suggestive comments to Ms. Streeter, like "Why you ain't came to see me," and "Why you dragging the wagon," referring to her buttocks. Other BOP staff who heard these comments, including Ms. Streeter's unit team, did nothing to intervene or stop Officer Hatten's inappropriate behavior targeted towards Ms. Streeter.

100.  As Officer Hatten did not re-initiate physical contact for some time, Ms. Streeter began to think that she could work in the rec shack again.

101.  Unfortunately, Officer Hatten's actions escalated further in or around July or August 2021, when Officer Hatten forced Ms. Streeter to have vaginal sex with him in the rec shack. Upon information and belief, Officer Hatten locked the rec shack's door so that no one would be able to enter.

102.  Officer Hatten's act of locking himself inside the rec shack together with a prisoner should have been alarming and suspicious to other BOP officers including rec staff, and yet no one intervened to stop Officer Hatten's assault.

103.  On this day, Officer Hatten ordered Ms. Streeter to clean the bathroom in the rec shack which was, upon information and belief, the staff bathroom. As she began to clean the bathroom, Officer Hatten followed her in and closed the bathroom door behind him.

104.  Ms. Streeter saw him unzip his pants. She did not know what to do. During her previous incarceration, she had been written up for assaulting an officer

after tapping him on the arm. Therefore, she was wary of offending or resisting Officer Hatten.

105.   Officer Hatten said, "You know what time it is." He demanded oral sex, indicating that he would not let her out of the bathroom unless she complied. The bathroom was very small, and there was no way for Ms. Streeter to physically leave the bathroom without passing by Officer Hatten.

106.   Ms. Streeter refused to give him oral sex. Officer Hatten proceeded to bend Ms. Streeter across the toilet and vaginally rape her. Ms. Streeter tried to tell Officer Hatten that she heard someone approaching the rec shack, to end the rape.

107.   He wore a condom, which upon information and belief, he flushed down the toilet after the rape. Officer Hatten told her to clean herself up and left the bathroom.

108.   After the rape, Ms. Streeter stopped volunteering for rec and refused to enter the rec shack again. Shortly afterward, in or around August 2021, Ms. Streeter submitted a request for transfer to Marianna Camp, which was approved, and was able to avoid Officer Hatten for some time.

109.   Unfortunately, Ms. Streeter's escape from Officer Hatten's abuse was short lived as she was returned to FCI Tallahassee on or around March 11, 2022 because of a disciplinary violation. Ms. Streeter was placed in the SHU at FCI Tallahassee for about eight months, up until around November 7, 2022. Prisoners

lose access to the bare modicum of privileges they have, including access to phone, mail, and recreation time, while they are in the SHU.

110.    The SHU placement gave Officer Hatten a further opportunity to accost and harass Ms. Streeter. Even though he was never a SHU officer, Officer Hatten took on additional shifts or overtime at the SHU and left his assigned posts to go to the SHU. He would do "rounds" in the SHU, constantly pass by Ms. Streeter's cell, and make inappropriate comments to her, like "Oh, you came back for me." Other BOP personnel knew or should have known about Officer Hatten's suspicious behavior. Nonetheless, no BOP personnel questioned Officer Hatten's visits to Ms. Streeter's SHU cell.

111.    Throughout the time that Ms. Streeter was isolated in the SHU, she did her best to brush off Officer Hatten's sexual comments and advances. She was relieved that Officer Hatten's physical interactions with her were limited because of her SHU confinement. However, there was still an occasion when Officer Hatten personally escorted her to the rec yard and intentionally pushed his body close against Ms. Streeter's backside and buttocks. Neither the correctional officers assigned to the SHU at the time, nor the facilities officers who typically worked in the yard, reported or stopped this unusual behavior.

112.    Upon information and belief, Lieutenant FNU Paramour, as the SHU officer, observed Officer Hatten visiting female prisoners while they were detained

in the SHU. Despite Officer Hatten having no legitimate purpose for being there, no BOP personnel including Officer Paramour ever questioned Officer Hatten or the female prisoners about these abnormal and unusual visits.

113. Despite being aware of Officer Hatten's suspicious behavior, his colleagues and supervisors refused to take any action, allowing him to act with impunity. Fortunately, in or around August 2022, a few months before Ms. Streeter was released from the SHU, Ms. Hernandez filed a formal report regarding Officer Hatten's rapes. After this, Officer Hatten "resigned" from his employment.

114. After she was released from the SHU in or around November 2022, Ms. Streeter decided to retain counsel and report the sexual abuse that she suffered. Ms. Streeter was subsequently compelled to participate in several internal and government interviews regarding her abuse. These interviews were held without an advocate or attorney present, which made Ms. Streeter extremely uncomfortable to the point of crying. She did not know if other BOP officers would find out about her report and possibly retaliate against her for turning in their colleague. Despite her efforts to cooperate with the investigation, Ms. Streeter was never given any update or information regarding the status of the investigation into Officer Hatten.

115. In the aftermath of Officer Hatten's abuse, Ms. Streeter felt completely unable to trust anyone, especially not any staff at FCI Tallahassee where she remains

incarcerated. This has led to her having increased feelings of isolation and disconnect from others, along with sadness and hopelessness.

116.    Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Streeter in an off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the rape occurred.

117.    Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending time alone and off-camera with Ms. Streeter. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Streeter. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

118.    Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, and/or Adamson were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff

Ms. Streeter's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Streeter safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

119. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as Ms. Streeter, demonstrating a plain disregard of an excessive risk to her safety and welfare.

120. The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

121. To this day, Ms. Streeter is continuing to suffer profound trauma resulting from Officer Hatten's abuse. Ms. Streeter has been diagnosed with complex

PTSD and persistent depressive disorder with anxious distress. The rec yard still serves as a glaring reminder of the abuse that she suffered. She suffers from intrusive memories, avoidance of people and places that remind her of the abuse, impairment of personal relationships, difficulty sleeping, and altered cognition about herself and others.

122.   Throughout Ms. Streeter's ongoing incarceration at FCI Tallahassee, BOP has failed to provide proper counseling or psychological treatment to Ms. Streeter, despite PREA and BOP mandates to provide her with such services. See 28 C.F.R. § 115.83.

123.   As a result of the foregoing, Ms. Streeter continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Streeter also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

124.   Upon information and belief, Ms. Streeter will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare,

and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's rape.

*Facts Pertaining to Plaintiff Ms. Neris*

125.   Ms. Neris arrived at FCI Tallahassee in or about December 2019, at 29 years of age. She remained incarcerated there until around December 2023 when she was transferred to a different BOP facility.

126.   Throughout this time, Ms. Neris was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Neris from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

127.   Throughout the four years she spent at FCI Tallahassee, Ms. Neris worked in several different positions, including as kitchen staff, unit orderly, and

laundry orderly. It was during her employment in the kitchen, from around August 2021 through October 2021, that Ms. Neris was sexually assaulted by Officer Hatten.

128. Prior to working in the kitchen, Ms. Neris noticed that Officer Hatten was overly friendly but did not think much of it. After she began to work in the kitchen in or around August 2021, Ms. Neris interacted with Officer Hatten daily as he took on the role of her direct supervisor when he picked up shifts in the kitchen. Consistent with his pattern of abuse, gradually, he took the opportunity to make inappropriate comments or fondle Ms. Neris's body. For example, he would often touch Ms. Neris's hand when she sat around the table at the dining hall (colloquially known as "chow hall").

129. Upon information and belief, around this time, even though Officer Hatten was still assigned to the rec detail, he frequently picked up overtime shifts in the kitchen to interact with prisoners working there, including Ms. Neris.

130. The interior of the kitchen as well as a back dock area by the kitchen presented blind spots from surveillance cameras. Officer Hatten knew this and spent an abnormal amount of time in these areas with certain women including Ms. Neris with an intent to groom or abuse them. Even though BOP staff should have noticed Officer Hatten's recurrent behavior of calling prisoners to off-camera areas and spending time with them, nothing was done to stop his suspicious behavior.

131.    Ms. Neris recalls Officer Hatten being one of the few, if not the only, officer who did so much overtime. Officer Hatten's sudden interest in picking up additional overtime shifts in the kitchen was highly suspicious. It was clear that he was trying to get every opportunity to have one-on-one access to prisoners, including Ms. Neris, and there were many opportunities for his colleagues and supervisors, including but not limited to Officers Jones, Love, Mitchell, Jackson, and Adamson, to report and stop Officer Hatten's suspicious behavior. This was in violation of 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

132.    On many occasions, Officer Hatten was the only officer supervising Ms. Neris while she worked in the kitchen. This was in violation of the BOP protocols where at least two officers should supervise the prisoners at a time. Other BOP officers knew or should have known that Officer Hatten was spending substantial amount of time with Ms. Neris in isolation, outside of security camera view. Yet not a single BOP employee questioned Officer Hatten's interest in Ms. Neris or their prolonged interactions off camera.

133.    BOP officers who were in the kitchen area should have seen the suspicious interactions between Officer Hatten and Ms. Neris. For instance, upon information and belief, Officer Shephard had overlapping shifts with Officer Hatten

in the kitchen. Instead of supervising prisoners together with Officer Hatten as he was required to do, Officer Shephard would typically leave Officer Hatten alone with the prisoners, thereby giving him unabated access to his pool of victims. Officer Shephard violated his obligations under 28 CFR § 115.61 to immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if Officer Shephard in fact reported his suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

134. Officer Hatten also began to bring Ms. Neris gifts, like lotions, gum, candy, and perfume. Upon information and belief, providing contraband to prisoners is a common, predatory tactic used in the context of sexual abuse and should have resulted in termination of Officer Hatten. At a minimum, other BOP staff, including Ms. Neris's unit team, with due diligence, should have noticed that Ms. Neris had access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hatten was allowed unfettered access to Ms. Neris.

135. In addition to numerous incidents of sexual harassment, Officer Hatten sexually assaulted Ms. Neris on at least three separate occasions, all of which

occurred during the 2-month period from around August 2021 through October 2021 when Ms. Neris was employed in the kitchen. The frequency of these sexual assaults was astonishing and should have been apparent to other BOP staff.

136.   During the first assault, Officer Hatten accosted Ms. Neris while she was working in the kitchen and aggressively groped her lower back, buttocks, and inner thighs.

137.   During the second assault, Officer Hatten again accosted Ms. Neris while she was working in the kitchen. This time, he groped her vagina through her clothes.

138.   The last assault was the most violent one. That day, Officer Hatten called Ms. Neris to upstairs rec on the second floor above the kitchen, under the pretense of carrying some boxes from the kitchen to upstairs rec.

139.   Ms. Neris complied and went to upstairs rec. When she arrived, she saw that Officer Hatten was alone. He unzipped his pants, exposing his penis to her. Officer Hatten then made Ms. Neris touch his penis. She was scared and panicked, not knowing what to do.

140.   Officer Hatten proceeded to grope her breasts and put his hand inside her pants. He then touched her clitoris and eventually digitally penetrated her vagina with two fingers.

141. After this digital rape, Ms. Neris felt humiliated and uncomfortable. She purposefully sought to avoid Officer Hatten at all cost. She quit her job at the kitchen, to distance herself from upstairs rec as well as Officer Hatten. She requested a work transfer to UNICOR, which is a call center where prisoners can work as service representatives to sell goods and services over the phone.

142. Despite her efforts to avoid him, Officer Hatten continued to seek her out. Whenever he saw her at rec, he would approach her and make derogatory remarks like, "You can't handle me" and "I'm not a snitch." He also frequently demanded her to meet him at the rec shack. Ms. Neris was too scared of being alone with him again and refused to go. Upset that Ms. Neris was rebuffing his advances, Officer Hatten began to treat Ms. Neris in a rude and disrespectful manner. Even though other BOP officers should have noticed these interactions, no officer reported Officer Hatten's actions or took any steps to prevent his abuse.

143. Ms. Neris did not feel comfortable reporting the sexual abuse until after she knew that Officer Hatten had left FCI Tallahassee in or around August 2022. Even though he never explicitly threatened Ms. Neris, she was nonetheless fearful of possible retaliation given all the power that officers have over prisoners.

144. Ms. Neris was further deterred from reporting her abuse because of FCI Tallahassee's poor reporting and confidentiality protocols. Ms. Neris was aware of

other occasions when prisoners were put in the SHU for investigation, and was therefore afraid that she would receive the same treatment for reporting on an officer.

145. Despite her fear, in or around February 2023, Ms. Neris decided to retain counsel and report the sexual abuse that she suffered. Ms. Neris was subsequently compelled to participate in several internal and government interviews regarding her abuse. Same as with Ms. Streeter, these interviews were held without an advocate or attorney present, which made Ms. Neris extremely uncomfortable.

146. Despite her efforts to cooperate with the investigation, Ms. Neris was never given any update or information regarding the status of the investigation into Officer Hatten. Throughout the remainder of her time at FCI Tallahassee, up until her transfer to another BOP facility in or around December 2023, Ms. Neris felt uncomfortable, as she felt that some staff members were gossiping about her sexual abuse. To this day, Ms. Neris feels extreme discomfort discussing her sexual abuse with any BOP staff.

147. Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Neris in off-camera areas without interruption. There were no security cameras that captured the kitchen or upstairs rec.

148. Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee.

Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Neris. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Neris. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

149. Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, Adamson, and/or Shephard, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff Ms. Neris's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Neris safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

150. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual

abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as Ms. Neris, demonstrating a plain disregard of an excessive risk to her safety and welfare.

151.   The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

152.   To this day, Ms. Neris is continuing to suffer profound trauma resulting from her victimization at Officer Hatten's hands. Ms. Neris continues to experience PTSD with associated intrusive flashbacks, increased depression, strong negative beliefs about herself and others, and loss of interest in activities she enjoyed before. As is common with survivors of sexual abuse, Ms. Neris places blame on herself for the abuse, which amplifies the trauma. BOP staff noted her condition as "ongoing desires to isolate, sleep, avoid food, and tearfulness throughout the day." She requires medications to manage depression and to help her sleep at night due to nightmares.

153.   Throughout Ms. Neris's ongoing incarceration, BOP has failed to provide proper counseling or psychological treatment to Ms. Neris, despite PREA and BOP mandates to provide her with such services. See 28 C.F.R. § 115.83.

154.   As a result of the foregoing, Ms. Neris continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Neris also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

155.   Upon information and belief, Ms. Neris will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's assaults.

*Facts Pertaining to Plaintiff Ms. Davis*

156.   Ms. Davis arrived at FCI Tallahassee in or around April 2021 at 29 years of age. She has been continuously incarcerated there through the present date.

157. Throughout this time, Ms. Davis was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hatten and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Davis from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

158. Ms. Davis arrived at FCI Tallahassee with hopes of participating in the Residential Drug Abuse Program (hereinafter "RDAP") to rehabilitate herself. Around November or December 2021, Ms. Davis was assigned to work in the rec shack. Originally, Ms. Davis was assigned to the morning shift under Officer Jones's supervision. However, within a few weeks, for reasons unknown and unexplained to Ms. Davis, she was transferred to the afternoon/evening shift under Officer Hatten's direct supervision.

159. As can be seen from Ms. Streeter's rape in the summer of 2021 and Ms. Neris's assaults in the fall of 2021, by the time Ms. Davis began to work for Officer Hatten in the winter of 2021, his *modus operandi* of spending time alone with certain

women in off-camera areas was apparent and pervasive. Nonetheless, other BOP officers including Officers Jones, Love, Mitchell, Jackson, and Adamson continued to condone and/or encourage Officer Hatten's conduct, repeatedly violating the operating protocols under which at least two officers should have supervised women working recreation details. As a result, Officer Hatten became further emboldened and more brazen with his abuse of Ms. Davis. He was not afraid of getting caught.

160. As was the case with Ms. Streeter and Ms. Neris, Officer Hatten initially presented himself to Ms. Davis as a friendly person, making conversations with her that became increasingly flirtatious over time.

161. Initially, Ms. Davis was not overly bothered with Officer Hatten's comments to her, calling her "pretty" or a "country bunny." She noticed that he was an openly flirtatious person, engaging in this type of behavior with numerous women, so did not think much of it. Moreover, she initially enjoyed her job at rec. At the time, FCI Tallahassee was still under COVID-19 lockdown, which strictly limited prisoners' outdoor time. Ms. Davis was grateful for the opportunity to get out of the unit and work.

162. After Ms. Davis was switched to working the afternoon/evening shift under Officer Hatten, their interactions became more frequent and more sexual. Repeating his typical routine, Officer Hatten began to bring her gifts that she would otherwise not have access to within the prison, including fingernail polish, chain

necklace, McDonald's coffee, and earrings. Ms. Davis inferred that Officer Hatten was gifting her these things in exchange for her engaging in his flirtation.

163. Other BOP personnel, including Ms. Davis's unit team, with due diligence, should have noticed that Ms. Davis had routine access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hatten was allowed unfettered access to Ms. Davis.

164. Over time, Officer Hatten escalated his abuse and began physically assaulting Ms. Davis as she worked in the rec shack. He would grope her body over her clothes any chance he had, including on her arms, lower back, and buttocks. She did not feel comfortable with the physical touches, but did not think that he cared and did not want to rebuff him in case he takes away her job. She wanted to keep her rec job and the small freedom outside of the housing unit that came with it.

165. Officer Hatten made sure that he was the only correctional officer supervising prisoners working recreation details, so that he could spend time alone with his victims. Indeed, he took every opportunity to spend time alone with Ms. Davis in the rec shack, behind the locked and/or closed door. This was well outside the normal routine and should have been noticed by other officers, including Officers Adamson, Jones, Mitchell, Love, and Jackson. These Officers violated their

mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

166.   Starting in or around January 2022, Officer Hatten began to place Ms. Davis on the call-out list to make her come to the rec shack by herself. Normally, prisoners were required to follow the rules to be either escorted by an officer from their unit to recreation or to go with other prisoners in their unit, but at Officer Hatten's behest, Ms. Davis went to the rec shack by herself with no supervision. She then spent a substantial amount of time with him inside the rec shack, behind a locked door. There were no security cameras that captured the inside of the rec shack. Officer Hatten's unusual behavior should have been noticed by other BOP staff including other recreational officers, Ms. Davis's unit team, and the facilities officers who typically monitor the rec yard. Nonetheless, BOP staff exercised no effort to investigate or stop Officer Hatten's suspicious conduct.

167.   Officer Hatten was emboldened to take his sexual abuse further and rape Ms. Davis. In or around January or February 2022, Ms. Davis was cleaning the

staff bathroom inside the rec shack after she was put on the call-out list by Officer Hatten. Officer Hatten walked into the bathroom and put his hands down her pants to grope her vagina.

168.  He digitally penetrated her vagina. Ms. Davis was startled. She knew that Officer Hatten had called her out individually, so she was alone. She knew that he had picked a time when no one was on the rec yard, and therefore, no one had seen her enter the rec shack. She knew that he would always lock the entrance to the rec shack, and that he had the key to unlock it. She also knew that there were no cameras inside. She did not know what she could do to escape.

169.  Officer Hatten's assault did not stop there. He proceeded to rape Ms. Davis with his penis. During this rape, Officer Hatten made humiliating comments to Ms. Davis such as, "How long has it been since you had some dick in your life?" and "I bet that pussy is good." Officer Hatten wore a condom that he ejaculated into.

170.  A few months later, in or around May or June 2022, Officer Hatten placed Ms. Davis on the call-out list again. This time, he requested that she report in the evening to assist with cleaning. It was unusual for an officer to order an individual call-out so that a prisoner would be left alone with the officer in the rec shack. It was also unusual for prisoners to be called to the rec shack for cleaning during evening hours, when no other officer or prisoner was around. Therefore, it

should have been apparent to BOP staff that Ms. Davis being called to the rec shack like this was highly abnormal.

171.  Nevertheless, Ms. Davis had no choice but to report to the rec shack. While Ms. Davis was sweeping or mopping the hallway, Officer Hatten took the opportunity to lock the rec shack door and began to grope Ms. Davis from behind. Officer Hatten proceeded to vaginally rape her for a second time, in the hallway. Again, upon information and belief, Officer Hatten used a condom.

172.  In between the two rapes, as well as after the second rape, Officer Hatten continued to make sexual comments and grope Ms. Davis's body over her clothes when he had the opportunity, up until he left FCI Tallahassee in or around August 2022. Ms. Davis believes that the reason she was not raped again is because Officer Hatten was sexually abusing Ms. Hernandez, which was well known throughout the facility among staff and prisoners.

173.  Ms. Davis remains extremely fearful of reporting her sexual abuse as she is still incarcerated at FCI Tallahassee. She believes that some of the officers are still friends with Officer Hatten. Many of his colleagues, including Officers Love, Jackson, and Adamson, continued to work at the facility. Ms. Davis still has years left in her prison sentence, and she does not feel comfortable reporting the sexual abuse that she suffered to FCI Tallahassee staff. She has seen other prisoners being

retaliated against for speaking up and believes that there is a culture of retaliation at FCI Tallahassee.

174. Ms. Davis followed Officer Hatten's trial and sentencing through prison newsletter. Upon seeing that he quickly pled guilty to sexually abusing one woman and received three months' sentence, compared to her own 151 months' sentence for a drug-related offense, Ms. Davis felt immense anger and humiliation. She began to experience more significant trauma symptoms, including extreme distrust in the BOP system. She has not sought counseling or medication from the BOP out of fear of retaliation for describing her sexual abuse by Officer Hatten.

175. Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms. Davis in off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the rape occurred.

176. Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending so much time alone and off-camera with Ms. Davis. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Davis. This failure

cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

177. Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Jones, Love, Mitchell, Jackson, and/or Adamson, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to Plaintiff Ms. Davis's safety under Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep Ms. Davis safe from Officer Hatten, in violation of mandatory BOP policies and federal regulations.

178. Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hatten; and his propensity in engaging in sexually inappropriate and abusive behavior. They took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring

victims such as Ms. Davis, demonstrating a plain disregard of an excessive risk to her safety and welfare.

179. The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

180. Even though Officer Hatten left FCI Tallahassee in or around August 2022, Ms. Davis remains trapped at the same facility where she suffered rapes at the hands of an officer who was duty-bound to protect her; and surrounded by the staff who failed to protect her.

181. To this day, Ms. Davis feels severely depressed with symptoms of hopelessness, distrust of others, disgust, fear, and anxiety. Her other symptoms include hypervigilance, social withdrawal, negative beliefs about her own self-worth, and recurrent flashbacks. She finds it difficult to move past the trauma that is repeatedly induced by going to the rec yard, seeing the rec shack, and hearing an officer's keys. This has led to Ms. Davis disconnecting from others and not going outside as often. Ms. Davis has been diagnosed with major depressive disorder and complex PTSD.

182. Throughout Ms. Davis's ongoing incarceration at FCI Tallahassee, BOP has failed to provide proper counseling or psychological treatment to Ms. Davis,

despite PREA and BOP mandates to provide her with such services. See 28 C.F.R. § 115.83.

183.   As a result of the foregoing, Ms. Davis continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Davis also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

184.   Upon information and belief, Ms. Davis will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare, and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hatten's rapes.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

## NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

185. Plaintiffs hereby repeat, reiterate, and incorporate by reference foregoing paragraphs relevant to their respective claims (*i.e.*, paragraphs 1 through 124 for Ms. Streeter; paragraphs 1 through 87 and 125 through 155 for Ms. Neris; and paragraphs 1 through 87 and 156 through 184 for Ms. Davis) with the same force and effect as if fully set forth herein.

*United States' liability for the acts and omissions of its employees*

186. At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Tallahassee, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, as well as Officer Hatten's other colleagues and/or supervisors whose identity is currently unknown to the Plaintiffs. Within the scope of their employment, these individuals were tasked to and did provide custodial care, control, and supervision to people incarcerated at FCI Tallahassee, including but not limited to the Plaintiffs.

187. At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and Officer Adamson held themselves out to persons incarcerated at FCI Tallahassee, and in particular to Plaintiffs, as correctional and/or administrative personnel with the knowledge,

capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

188. At all relevant times, FCI Tallahassee personnel including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, within the scope of their employment with the United States, owed a non-delegable duty of care to Plaintiffs while they were housed at FCI Tallahassee.

189. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that correctional and/or administrative personnel with a history of sexual assaults were not allowed to harm or injure other incarcerated people.

190. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to use reasonable care for the safety of incarcerated individuals within their custodies.

191. It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to maintain, operate, and control FCI Tallahassee as a safe and secure space for persons in it, including but not limited to Plaintiffs.

192.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to provide adequate custody, control, supervision, and monitoring to persons at FCI Tallahassee, including but not limited to Plaintiffs.

193.   It was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to adequately protect incarcerated people including Plaintiffs from the foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Hatten.

194.   As described in paragraphs 47, 55, 64-66, 79, 93, 131, 133, and 165, it was the duty of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as well as Officer Hatten's other colleagues and supervisors, as federal employees, while acting within the scope of their office or employment, to ensure that any suspicion or indication of sexual abuse was reported through the chain of command for full investigation. Such suspicion or indication of sexual abuse would include Officer Hatten's suspicious conduct as described in paragraphs 7, 11, 21, 98, 102, 110, 113, 117, 130, 148, and 166; his violation of the operating protocols and/or rules as described in paragraphs 6, 18-21, 51, 67-68, 91, 119, 132, 134, 144, 150, 159, and 163; and his provision of contraband and/or other benefits

to his victims including the Plaintiffs as described in paragraphs 6, 8, 20, 55, 58-63, 134, and 162.

195. It was the duty of Officer Adamson and other supervisory officers whose identity is currently unknown to the Plaintiffs, as federal employees, while acting within the scope of their office or employment, to ensure that all BOP employees are trained, supervised, and monitored properly.

196. As described in paragraphs 3, 5, 19, 53-54, 65, 83-84, 87, 116-117, 130, 148, 159, and 176, it was the duty of certain supervisory and/or administrative staff whose identity is currently unknown to the Plaintiffs, as federal employees, while acting within the scope of their office or employment, to ensure that security cameras are installed, monitored, and attended to throughout FCI Tallahassee, such that sexual assaults described herein would not occur under their watch.

197. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, as federal employees and while acting within the scope of their office or employment, breached each of the foregoing duties in paragraphs 186 through 196 that they owed to Plaintiffs by failing to take adequate steps to protect them from Officer Hatten promptly, despite the numerous warning signs and indications of sexual abuse presented by Officer Hatten. To the extent that any other correctional, supervisory, and/or administrative staff of FCI Tallahassee, such as SHU officers or lieutenants (see paragraphs 5, 109-112), Plaintiffs' unit team (see

paragraphs 8-9, 20, 99, 134, 163, 166, 170), facilities or yard officers (see paragraphs 5, 8, 111, 166, 170), investigators or wardens (see paragraphs 50, 61), or other job supervisors (see paragraphs 63-67, 133), were aware of Officer Hatten's sexually abusive conduct and turned a blind eye to it, they also breached the duties owed to the Plaintiffs by failing to take adequate steps to protect her from Officer Hatten promptly.

198. The breach by federal employees described in paragraph 197 directly exposed each Plaintiff to an unreasonable risk of bodily injury, causing her to fear for her life and safety, and resulted in her being assaulted by Officer Hatten as described above.

199. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

200. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history

of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

201. Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 58, 91-93, 131, 158-159, and 165, Officer Jones observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

202. Officer Jones, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

203. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

204. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his

employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

205. Officer Jones, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

206. Officer Jones, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

207. In each of the foregoing ways as alleged in paragraphs 199 through 206, Officer Jones did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

208. In each of the foregoing ways as alleged in paragraphs 199 through 206, Officer Jones, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

209.   In each of the foregoing ways as alleged in paragraphs 199 through 206, Officer Jones, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

210.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

211.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

212.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 59, 91-93, 131, 159, and 165, Officer Love observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior,

investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

213. Officer Love, as a federal employee and while acting within the scope of his employment, knew that there were prior incidents at FCI Tallahassee where officers sexually abused prisoners with similar *modus operandi* as Officer Hatten's, and yet ignored the blatant suspicions and/or indications of Hatten's sexual abuse.

214. Officer Love, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

215. Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

216. Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

217.    Officer Love, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

218.    Officer Love, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

219.    In each of the foregoing ways as alleged in paragraphs 210 through 218, Officer Love did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

220.    In each of the foregoing ways as alleged in paragraphs 210 through 218, Officer Love, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

221.    In each of the foregoing ways as alleged in paragraphs 210 through 218, Officer Love, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

222.    Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely

to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

223. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

224. Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 60, 91-93, 131, 159, and 165, Officer Mitchell observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

225.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

226.  Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

227.  Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

228.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

229.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise,

investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

230. In each of the foregoing ways as alleged in paragraphs 222 through 229, Officer Mitchell did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

231. In each of the foregoing ways as alleged in paragraphs 222 through 229, Officer Mitchell, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

232. In each of the foregoing ways as alleged in paragraphs 222 through 229, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

233. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

234. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with

him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

235. Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 61, 91-93, 131, 159, and 165, Officer Jackson observed that Officer Hatten was interacting and meeting with prisoners including the Plaintiffs in an unusual manner, such that she knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet she did not do so.

236. Officer Jackson, as a federal employee and while acting within the scope of her employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

237. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

238. Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

239. Officer Jackson, as a federal employee and while acting within the scope of her employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. She enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

240. Officer Jackson, as a federal employee and while acting within the scope of her employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

241. In each of the foregoing ways as alleged in paragraphs 233 through 240, Officer Jackson did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

242. In each of the foregoing ways as alleged in paragraphs 233 through 240, Officer Jackson, as a federal employee and while acting within the scope of her employment, neglected to apply the skill she did have.

243. In each of the foregoing ways as alleged in paragraphs 233 through 240, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not use reasonable care in applying the skill she had.

244. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiffs and other people incarcerated at FCI Tallahassee.

245. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

246. Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiffs in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 62, 91-93, 131, 159, and 165, Officer Adamson observed that Officer Hatten was interacting and meeting with prisoners including

the Plaintiffs in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

247. Officer Adamson, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

248. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide each Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon each Plaintiff without any restraints or supervision.

249. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as Officer Hatten's direct supervisor, allowed him unfettered access to his victims under the pretext of supervising female prisoners working in recreation.

250. Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to each Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

251. Officer Adamson, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to each Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing each Plaintiff directly in harm's way.

252. Officer Adamson, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

253. In each of the foregoing ways as alleged in paragraphs 244 through 252, Officer Adamson did not possess the necessary skill to maintain a safe and secure environment and protect each Plaintiff from foreseeable harm.

254. In each of the foregoing ways as alleged in paragraphs 244 through 252, Officer Adamson, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

255. In each of the foregoing ways as alleged in paragraphs 244 through 252, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

256. United States is the sole proper defendant for each breach of duty by federal employees, Officers Jones, Love, Mitchell, Jackson, and/or Adamson alleged

in foregoing paragraphs 188 through 255 under the FTCA. United States is vicariously liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

257. Each Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of United States' employees including Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

258. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's employment at FCI Tallahassee was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

259. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of each Plaintiff.

260. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson were aware of facts that gave rise to an unreasonable risk that each Plaintiff would be irreparably injured.

261. It was foreseeable to Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, based on the facts known to them, that each Plaintiff was at risk of imminent serious harm including sexual abuse.

262. Yet, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson in their official capacities failed and/or refused to prevent the abuse of each Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

263. Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, acting as agents, servants, contractors, and/or employees of the United States, knew that they had an opportunity to intervene and prevent the exacerbation of each Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

264. The failure of FCI Tallahassee personnel, including Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, to prevent, investigate, or acknowledge Officer Hatten's sexual abuse of prisoners, including Plaintiffs, served no legitimate policy purpose. On the contrary, FCI Tallahassee staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. The failure to do so by Officer Jones, Officer Love, Officer Mitchell, Officer Jackson,

and/or Officer Adamson, and/or other personnel currently unknown to Plaintiffs, was patently outside of their discretionary function.

*United States' liability for its own acts and omissions*

265.   Defendant United States also had independent duty owed to the Plaintiffs to adequately protect people incarcerated in its custody and to exercise due diligence in hiring, training, retaining, and supervising its employees.

266.   Defendant United States failed abjectly in its duty to detect, prevent, and investigate sexual abuse in its facility (see paragraphs 81-84), to safeguard its prisoners from its own employees (see paragraphs 71-75, 142-145, 173), to provide psychological care and treatment to these victims (see paragraphs 122, 153, 174, 182), and to provide a reliable, confidential reporting mechanism (see paragraphs 24, 143-146).

267.   Defendant United States failed to provide reasonably safe environment to each Plaintiff, who was under its care, custody, and control without ability to escape.

268.   Each Plaintiff's injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was

suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

269. Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in improperly hiring, training, retaining, supervising, and/or disciplining Officer Hatten as described in paragraphs 17, 46, 48, 50, 66, 69, and 71.

270. Despite actual and constructive notice of Officer Hatten's abuse, Defendant United States acted negligently in failing to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate with impunity.

271. Defendant United States acted negligently in hiring Officer Hatten, as well as Officers Jones, Love, Mitchell, Jackson, and/or Adamson, who did not possess the necessary skill to maintain safe and secure environment and protect each Plaintiff from foreseeable harm.

272. Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

273. United States' acts and omissions as described in paragraphs 265 through 271 proximately caused each Plaintiff's injuries.

*Summary*

274. The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, and the United States constitute the tort of negligence under the laws of the State of Florida.

275. Based on the foregoing circumstances, the United States, if it were a private person, would be liable to each Plaintiff in accordance with the laws of Florida, for the negligence upon each Plaintiff.

276. Each Plaintiff's injuries were inflicted through no fault or want of care or contributory negligence on the part of the Plaintiff.

277. Officer Hatten's rape and continued abuse of each Plaintiff meets Florida state's requirements for physical impact.

278. As a direct and proximate result of the foregoing, Plaintiff Ms. Davis, Ms. Neris, and Ms. Streeter each suffered debilitating psychological trauma,

excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

279.   As a direct and proximate result of the foregoing, Plaintiff Ms. Davis, Ms. Neris, and Ms. Streeter has each suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## SECOND CLAIM FOR RELIEF

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

280. Plaintiffs hereby repeat, reiterate, and incorporate by reference foregoing paragraphs relevant to their respective claims (*i.e.*, paragraphs 1 through 124 and 185 through 279 for Ms. Streeter; paragraphs 1 through 87, 125 through 155, and 185 through 279 for Ms. Neris; and paragraphs 1 through 87 and 156 through 279 for Ms. Davis) with the same force and effect as if fully set forth herein.

281. As described in paragraphs 185 through 279, Defendant United States, individually or through Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, in their official roles and capacities as agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to each Plaintiff.

282. The acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, described in paragraphs 185 through 279, constituted extreme and outrageous conduct.

283. Each Plaintiff in fact suffered debilitating emotional suffering.

284. The above-described acts and omissions of Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson constitute the tort of negligent infliction of emotional distress under the laws of the State of Florida.

285. Florida state law only recognizes this tort if it meets the requirements under the impact rule, which requires either physical touch or a physical manifestation of emotional distress. The "touch" requirement can be met with a foreign object, such as a gun or by a perpetrator's hands. Therefore, even without a physical manifestation of emotional harm, the Court can make a finding of negligent infliction of emotional distress. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846 (Fla. 2007).

286. Here, Officer Hatten raped and sexually abused each Plaintiff, meeting the requirement of both physical touch and physical manifestation of emotional distress. Officer Hatten's sexual abuse of each Plaintiff was severe and repetitive, and caused each Plaintiff physical pain and extreme emotional trauma.

287. Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

288. Based on the foregoing circumstances, the United States, if it were a private person, would be liable to each Plaintiff in accordance with the laws of Florida, for the negligent infliction of emotional distress upon each Plaintiff.

289. As a direct and proximate result of the foregoing, Plaintiff Ms. Davis, Ms. Neris, and Ms. Streeter each suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

290. As a direct and proximate result of the foregoing, Plaintiff Ms. Davis, Ms. Neris, and Ms. Streeter has each suffered serious harm including, without

limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs pray for judgment as set forth below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Anne Davis, Angelica Neris, and Jaceta Streeter respectfully request that judgment be entered against Defendant United States, and that this Court grant the following to each Plaintiff:

1.    An award of compensatory damages for all injuries caused by the Defendant, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2.    An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3.    An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4.    An award of reasonable attorneys' fees to the fullest extent permitted by law; together with

5.      Such other and further relief at law or in equity as this Court may deem

just and proper.


S/ *Jaehyun Oh*
**JAEHYUN OH***
The Jacob D. Fuchsberg Law Firm,
LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
New York Bar No. 5668512
Tel: (212) 869-3500 Ext. 245
j.oh@fuchsberg.com
*Attorney for Plaintiffs*
(* *Pro Hac Vice* Application
Forthcoming)

S/ *Whitney Marie Untiedt*
**WHITNEY MARIE UNTIEDT**
Untiedt Dabdoub, PLLC
1600 Ponce De Leon Blvd., 10th Floor,
Coral Gables, FL 33134
Florida Bar No. 15819
Tel: (305) 330-2397
whitney@udlawyers.com
*Attorney for Plaintiffs*